## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED SPACE ALLIANCE, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**HILDA L. SOLIS, in her official capacity as United States Secretary of Labor, et al.,**<br><br>**Defendants.** | **Civil Action 11-746  (RCL)** |

## MEMORANDUM OPINION

This case involves a dispute between the Office of Federal Contract Compliance Programs and United Space Alliance, LLC.  OFCCP, an agency within the Department of Labor, is responsible for ensuring that federal contractors comply with their nondiscrimination obligations.  United Space, a federal contractor that works in human space operations, refuses to provide OFCCP with information that the agency has requested and that the Department of Labor has now ordered United Space to produce.  United Space challenges the lawfulness of that order on the basis of its Fourth Amendment right to be free from unreasonable searches and seizures, the government's obligations under the Administrative Procedure Act, and several other grounds.  Before the Court are the government's motion to dismiss the complaint or, in the alternative, for summary judgment [Dkt. # 18], and United Space's cross-motion for summary judgment [Dkt. # 21].  Upon consideration of the motions, the oppositions thereto, and the record of this case, the Court concludes that the government's motion should be granted and United Space's motion denied.

# I.  LEGAL BACKGROUND

Under Executive Order 11246, federal contractors whose contracts exceed a certain value must agree that they "will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin," and "will furnish all information and reports required by [the executive order] and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to [the contractor's] books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders."  Exec. Order No. 11246, § 202.[1]  These terms must be included in every government contract that is not expressly exempted from the requirement.  *Id.* § 204.  As authorized by the executive order, *id.* § 401, the Secretary of Labor has delegated her authority and responsibility for enforcing these agreements to the Deputy Assistant Secretary for Federal Contract Compliance, who directs the Office of Federal Contract Compliance Programs.  41 C.F.R. § 60-1.2; *see also* 74 Fed. Reg. 58,834 (Nov. 13, 2009).

The regulations implementing Executive Order 11246 authorize OFCCP to conduct compliance evaluations of a covered contractor "to determine if the contractor maintains nondiscriminatory hiring and employment practices."  41 C.F.R. § 60-1.20(a).  These evaluations may take the form of a "compliance review," which can itself involve a "desk audit" in which OFCCP analyzes contractor-provided data at its own office, an on-site review conducted at the

---

[1] All citations to Executive Order 11246 refer to the current text of the executive order, as amended.  *See* Exec. Order No. 11,246, 30 Fed. Reg. 12,319 (Sept. 24, 1965), *amended by* Exec. Order No. 11,375, 32 Fed. Reg. 14,303 (Oct. 13, 1967), *amended by* Exec. Order No. 11,478, 34 Fed. Reg. 12,985 (Aug. 8, 1969), *amended by* Exec. Order No. 12,086, 43 Fed. Reg. 46,501 (Oct. 5, 1978), *amended by* Exec. Order No. 13,279, 67 Fed. Reg. 77,141 (Dec. 12, 2002).

contractor's establishment, *id.* § 60-1.20(a)(1)(i)-(ii), "an off-site analysis of information supplied by the contractor or otherwise gathered during or pursuant to the on-site review," *id.* § 60-1.20(a)(1)(iii), or all three. *Id.* § 60-1.20(a)(1). When OFCCP has reasonable cause to believe that a contractor has violated the executive order or its implementing regulations, the agency may issue a notice to show cause why enforcement proceedings should not be initiated, *id.* § 60-1.28, and, after reasonable attempts at conciliation, may refer the matter to the Solicitor of Labor to initiate such proceedings. *Id.* § 60-1.26(b). Enforcement proceedings are held before an administrative law judge. *Id.* § 60-1.26(b)(2). Although these proceedings usually allow for normal civil discovery, including interrogatories, depositions, document requests, and requests for admission, *id.* § 60-30.9–30.11, when a contractor "has refused to give access to or to supply records or other information as required by the equal opportunity clause[,] or has refused to allow an on-site compliance review to be conducted," *id.* § 60-30.31, the proceeding may be expedited. In expedited enforcement proceedings, discovery is limited to requests for admissions, an exchange of witness lists, and depositions, if good cause is shown by the party seeking the deposition. *Id.* § 60-30.33. After discovery is completed, an administrative law judge holds a hearing on the record and recommends findings, conclusions, and a decision to the Administrative Review Board of the Department of Labor. *Id.* § 60-30.35. The parties may submit exceptions to those recommendations. *Id.* § 60-30.36. After considering the recommendations and any exceptions to them, the Administrative Review Board issues a final administrative order. *Id.* § 60-30.37. If the Board does not issue a final administrative order within thirty days of the administrative law judge's recommended decision, that recommendation becomes the final administrative order. *Id.* Failure to comply with a final order exposes the contractor to the cancellation of its current government contracts and debarment from future

contracts.  *Id.* § 60-30.30.

## II. FACTS

On August 7, 2009, OFCCP initiated a compliance evaluation of the United Space

facility in Cape Canaveral, Florida.  AR 1071–75.[2]  The evaluation began with a desk audit.  As

relevant to this case, OFCCP requested that United Space submit for its review annualized

compensation data broken up by race, gender, and the employees' "salary range, rate, grade, or

level."  AR 1075.  Because these data were the eleventh and final item in a list of OFCCP

requests, the parties refer to them as "Item 11 data."  United Space submitted the compensation

data, AR 1077–94, and OFCCP analyzed them.  AR 800–10.  This dispute arises from the way in

which OFCCP performed that analysis.

First, an OFCCP compliance officer entered the United Space compensation data into a

spreadsheet provided by the national office.  That spreadsheet contained an algorithm that the

national office had developed to compare the earnings of certain groups—here, men and women.

As described on the OFCCP website, the algorithm determined whether a certain percentage of

the men or women in the United Space workforce worked in job groups in which their gender

earned on average a certain percentage less than the other gender.  If the pay gaps within job

groups negatively affected enough members of either gender by a large enough amount, then the

algorithm compared the percentage of women working in a job group in which a pay disparity

above the threshold level disfavored women to the percentage of similarly situated men.  If that

ratio exceeded a certain threshold, the algorithm indicated potential compensation

discrimination.  AR 1165.  The parties refer to this algorithm as the "threshold test."

---

[2] All citations to the administrative record are so noted.

Applied to the data submitted by United Space, the threshold test did not indicate

potential compensation discrimination.  AR 805.  However, the OFFCP compliance officer

found patterns in the data that he believed to be indications of troubling disparities between the

pay of men and women.  His supervisor, Miguel Rivera, agreed that "it appeared that women

were earning less more frequently than men,"  AR 758–59, and performed a series of additional

calculations.  The supervisor's calculations revealed that 75.7% of the women in the United

Space workforce worked in job groups in which women earned, on average, less than men, while

only 17.7% of men worked in job groups in women earned, on average, more.  AR 770–71, 777,

1090.  The parties often refer to this calculation as the "pattern analysis."  Mr. Rivera then

eliminated from that calculation any job group with fewer than thirty workers, or fewer than five

members of either gender, and found that 76.3% of the remaining women worked in job groups

in which women earned, on average, less than men, while only 13.5% of the remaining men

worked in job groups in which women earned, on average, more.  AR 772–78, 1090.  The parties

refer to this calculation as the "30-5 test."

Based on these analyses, OFCCP decided to request additional data from United Space.

The agency sent a letter to United Space stating that it had found "unexplained differences in

average compensation that require further investigation of your company's compensation

practices."  AR 1095.  OFCCP requested that United Space provide more detailed data on its

employee compensation.  AR 1095–96.  United Space responded that, based on its own analysis

of the data that it had submitted, it believed that the OFCCP request was unjustified.  United

Space indicated that it had performed its analysis by referring to the publicly-available

description of the threshold test and the "actual audit experiences of many contractors," based on

which "it has been widely reported that the specified percentage thresholds" for the threshold

test "is [sic] 5% average differences, affecting at least 10% of the protected class population, and

that the percent protected class affected is three times the percent non-affected class."  AR 1097.

OFCCP responded by reiterating and slightly altering its data request.  AR 1099–1100.  The

agency also noted that the publicly-available description of the threshold test stated that the

thresholds were "not static, but rather . . . subject to change as OFCCP continues to evaluate its

targeting methodology."  AR 1099 (quoting AR 1165) (internal quotation mark omitted).

OFCCP also made clear that it could not endorse any third-party analysis that claimed to

replicate an agency analysis.  *Id.*  After United Space continued to challenge the basis for

OFCCP's second data request, AR 1496–1501, the agency sent a letter noting that it had not

received the requested information and scheduling an on-site review of United Space records.

AR 1503–06.  United Space responded that it would agree to provide additional data in a format

different than that requested by OFCCP, would only provide it under certain conditions, and

would not permit an on-site inspection unless the same conditions were satisfied.  AR 1510,

1514.  OFCCP issued a notice to show cause why enforcement proceedings should not be

initiated.  AR 1512–15.  United Space repeated that it would be willing to provide the data

requested under certain conditions.  AR 1517–20.

OFCCP filed an administrative complaint against United Space, AR 4–7, and sought an

expedited hearing pursuant to 41 C.F.R. § 60-30.31, on the grounds that United Space had

"refused to give access to or supply records and information" and had "refused to allow an onsite

compliance review to be conducted."  AR 5.  United Space objected to the expedited

proceedings on the grounds that they would not allow for proper consideration of whether the

United Space data request was "appropriate under the published OFCCP standards" and

"justified under pertinent legal standards," AR 24, but its motion to remove the administrative

complaint from expedited hearing procedures was denied, AR 208–09, as was its motion for reconsideration of that denial.  476–77.

At the administrative hearing, Miguel Rivera testified about his analysis of the United Space data.  United Space presented the testimony of a labor economist, who criticized that analysis.  AR 955.  At the close of the hearings, United Space argued that under *Marshall v. Barlow's*, 436 U.S. 307 (1978), the OFCCP request for additional data violated the Fourth Amendment.  AR 1052.  United Space further argued that the Administrative Procedure Act required the agency to base any request for additional information on the results of the standard threshold test endorsed by the national office, AR 1058–62, and that the agency had violated the Fifth Amendment and the Paperwork Reduction Act.  AR 1062–65.  OFCCP, in turn, argued that the data request had a "reasonable basis" and so satisfied the Fourth Amendment, AR 1047–50, that the threshold analysis was not binding on the agency under the Administrative Procedure Act, AR 1042–46, that there was no evidence of a violation of the Equal Protection component of the Fifth Amendment, AR 1046–47, and that the data request was an "investigation involving an agency against specific individuals or entities," 44 U.S.C. § 3518(c)(1)(B)(ii), and therefore exempt from the requirements of the Paperwork Reduction Act.  AR 1040–41.

In his recommended decision and order, the administrative law judge determined that OFCCP was required to have "a reasonable suspicion of [a] violation of the Executive Order," to issue its data request, that the actions of its officials had been "prudent and quite reasonable," and that the additional data request was "quite limited in scope."  AR 1757.  He decided that the public description of the threshold test was "a mere policy statement" and not binding on the agency, AR 1762, that the agency's information request was an individualized audit to which the Paperwork Reduction Act did not apply, AR 1758, and that United Space had offered no facts

sufficient to demonstrate either vindictive prosecution, AR 1759–60, or an equal protection

violation.  AR 1758–59.  The administrative law judge recommended that United Space be

required "to comply with the desk audit" and that, if the Administrative Review Board required

United Space to comply with an on-site review as well, that review be limited to gathering data

and/or documents related to OFCCP's most recent request for information.  AR 1763.

United Space filed exceptions to the recommendation, in which it expanded upon the

arguments that it had made before the administrative law judge.  AR 1809–40.  In response to

those exceptions, OFCCP defended the recommendation that United Space be ordered to comply

with the agency's request for information, and argued that the company should also be ordered to

submit to an on-site review of documents.  AR 1841–97.  The Administrative Review Board did

not issue a final administrative order within thirty days after the time for filing exceptions

expired, and so the recommended decision and order of the administrative law judge became the

final administrative order.  AR 1938–39.  United Space petitioned this Court for relief from that

order.

### III. JURISDICTION AND STANDARD OF REVIEW

United Space brings its claims under the Administrative Procedure Act and the U.S.

Constitution.  Although "the APA neither confers nor restricts jurisdiction," *Trudeau v. FTC*,

456 F.3d 178, 185 (D.C. Cir. 2006), this Court has jurisdiction over those claims under 28 U.S.C.

§ 1331.  *See id.*  The APA gives United Space the right to challenge a final administrative order

that has been issued against it.  *See* 5 U.S.C. § 702.  Under the familiar standards set out by the

statute, "[t]o the extent necessary to decision and when presented, the reviewing court shall

decide all relevant questions of law, interpret constitutional and statutory provisions, and

determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  A

reviewing court must, as relevant here, "hold unlawful and set aside agency action . . . found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right . . . ; [or] (C) in excess of statutory . . . authority . . . ." 5 U.S.C. § 706(2); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) ("In all cases agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements.") (quoting 5 U.S.C. § 706(2)).

"[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The entire case on review is a question of law, and only a question of law." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). When an agency's findings are at issue, the question of law is "whether [the agency] acted in an arbitrary and capricious manner." *Univ. Med. Ctr. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999). This analysis is conducted under the substantial evidence standard, which requires that a court "determine only whether the agency could fairly and reasonably find the facts as it did." *Robinson v. Nat'l Transp. Safety Bd.*, 28 F.3d 210, 215 (D.C. Cir. 1994) (internal quotation marks and ellipses omitted). "[I]n the context of the APA, arbitrary and capricious review and the substantial evidence test '"are one and the same" insofar as the requisite degree of evidentiary support is concerned.'" *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 243 (D.C. Cir. 2008) (quoting *Consumers Union of U.S., Inc. v. FTC*, 801 F.2d 417, 422 (D.C. Cir. 1986) (quoting *Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984))); *see also Mem'l Hosp./Adair Health Ctr., Inc. v. Bowen*, 829 F.2d 111, 117 (D.C. Cir. 1987) (noting that the "substantial evidence" standard is "that aspect of the

arbitrary and capricious test usually applied to review of agency adjudications," and emphasizing that "its use does not connote stricter scrutiny of agency action").  When the constitutionality of an agency's action and not the rationality of its findings is challenged, however, a district court must (like any appellate tribunal) determine for itself whether the agency based its decision on the appropriate constitutional standard.  5 U.S.C. § 706; *Crowell v. Benson*, 285 U.S. 22, 60 (1932) ("In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions . . . of . . . law, necessary to the performance of that supreme function.").

The government has moved to dismiss or, in the alternative, for summary judgment.  Although, in the context of challenges to agency actions, "there is no real distinction . . . between the question presented on a 12(b)(6) motion and a motion for summary judgment," *Marshall Cnty. Health Care Auth.*, 988 F.2d at 1226, the Court of Appeals has suggested that "[i]t is probably the better practice for a district court always to convert to summary judgment" in such cases.  *Id.* at 1226 n.5.  This Court therefore treats the government's motion as one brought for summary judgment, and evaluates both it and United Space's cross-motion for summary judgment under the standards discussed above.

## IV.  ANALYSIS

This case concerns the validity of a final order issued by the Administrative Review Board of the Department of Labor.  Before evaluating the parties' arguments, the Court must be clear about precisely what was ordered.  At the conclusion of the administrative hearing, the administrative law judge recommended that:

> 1.    The Administrative Review Board (ARB) order Defendant to comply with

the desk audit within thirty days of the ARB's Final Decision;

2.    Should the ARB order defendant to comply with the on-site compliance review, it is recommended that the compliance review should be limited to gathering the data and/or documents related to the 18 questions concerning possible violations of the Executive Order; and

3.    Should Defendant fail to comply with the desk audit and/or on-site compliance review, it is recommended that the ARB cancel all Defendant's present federal contracts and debar all future federal contracts until such time as Defendant is in compliance with the ARB's order.

AR 1763 (footnote omitted).

Although the first recommendation's reference to "the desk audit" is not entirely transparent, in the context of the recommended decision this phrase evidently refers to the amended information request that OFCCP issued on December 10, 2009.  AR 1099–1100.  As to the second item, the government concedes that it does not constitute a recommendation that the Administrative Review Board order compliance with an on-site review.  Gov't Reply Br. at 6 n.2.  Rather, it recommends only that, if an on-site review were to be ordered, it should be limited in certain ways.  Because the second recommendation was conditioned on an action that the Board did not take—that is, ordering United Space to comply with an on-site review—it is now a nullity.[3]  In sum, the final agency action that this Court reviews is an order that United Space produce the information requested by OFCCP in its letter of December 10, 2009.  With this initial matter clarified, the Court goes on to consider the parties' arguments as to the legality of that order.

## A.  Administrative Procedure Act

United Space brings two significant challenges under the Administrative Procedure Act. The company argues first that the final administrative order is "not in accordance with law," 5

---

[3] The Court need not construe the present effect of the third recommendation, which addresses the consequences for United Space if it refuses to comply with the order.

U.S.C. § 706(2), because the regulations governing OFCCP investigations only permit the agency to require the production of additional documents for off-site review in conjunction with an on-site inspection.[4]  The company then argues that, even if such an order is permitted by the published regulations, an internal agency policy barred OFCCP from requesting additional compensation data under the circumstances that it did.  The Court addresses each argument in turn.[5]

### i.  OFCCP Authority to Order Document Production

Executive Order 11246 requires that covered contractors "furnish all information and reports required by [the executive order] and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto."  Executive Order 11246, § 202.  The regulations implementing the executive order provide that "OFCCP may conduct compliance evaluations to determine if the contractor maintains nondiscriminatory hiring and employment practices."  41 C.F.R. § 60-1.20(a).  "A compliance evaluation may consist of any one or any combination of . . . investigative procedures" including a compliance review, 41 C.F.R. § 60-1.20(a)(1), and an off-site review of records.  41 C.F.R. § 60-1.20(a)(2).

---

[4] Although United Space frames this objection as part of its challenge under the Fourth Amendment, *see* United Space Reply Br. at 7, this Court believes that the argument is more properly considered under the usual APA standard.

[5] United Space also argues that OFCCP was required to provide notice of the way in which it would analyze the data submitted by federal contractors.  The APA requires agencies to give notice of "statements of general policy or interpretations of general applicability formulated and adopted by the agency."  5 U.S.C. § 552(a)(1)(D).  However, the "pattern analysis" performed by Miguel Rivera "is not a statement of future effect that allows agency officials discretion with respect to their current conduct.  Rather, it [is] a mathematical formula that the agency chose to employ in this particular case and need never employ again."  *BMY v. United States*, 693 F. Supp. 1232, 1245 (D.D.C. 1988) (internal citations omitted).  And even if the particular analysis at issue here were a statement of general policy, it would fall within the exception to APA notice requirements for "techniques and procedures for law enforcement investigations."  5 U.S.C. § 552(b)(7)(E).

In its initial letter to United Space, OFCCP stated that it had selected the company "for a compliance review under Executive Order 11246, as amended," and that the agency would "conduct the compliance review as described in the regulations at 41 CFR 60-1.20(a)(1)." AR 1071. Those regulations state that a compliance review is a "comprehensive analysis of the hiring and employment practices of the contractor," which "may proceed in three stages." 41 C.F.R. § 60-1.20(a)(1). The first stage is "a desk audit of the written [affirmative action plan] and supporting documentation." 41 C.F.R. § 60-1.20(a)(1)(i). As relevant here, "[t]he desk audit is conducted at OFCCP offices." *Id.* The second stage is an "on-site review, conducted at the contractor's establishment to investigate unresolved problem areas identified in the [affirmative action plan] and supporting documentation during the desk audit," 41 C.F.R. § 60-1.20(a)(1)(ii), and the third is "an off-site analysis of information supplied by the contractor or otherwise gathered during or pursuant to the on-site review." 41 C.F.R. § 60-1.20(a)(1)(iii). As part of its desk audit (and as discussed above) OFCCP typically requests that a contractor submit annualized compensation data broken up by race, gender, and "salary range, rate, grade, or level," *see* AR 1075, which are commonly referred to as "Item 11 data." When analyzing these data,

> OFCCP has historically used a tiered-review approach . . . . Under the tiered-review approach . . . . [o]nce it receives the Item 11 data, OFCCP conducts a simple comparison of group average compensation by pay grade or other aggregation unit by which the employer has provided the data. If this comparison indicates a significant disparity, OFCCP will ask the contractor for employee-specific compensation and personnel information.
>
> 71 Fed. Reg. 35,124, 35,125 (June 6, 2006).

The agency has announced that it "intends to continue this tiered-review approach." *Id.*

United Space argues that the agency's long-standing approach is unauthorized by the underlying regulations. In its briefing and at oral argument, the company asserted that to the

extent that the government wants to conduct an "off-site analysis of information," 41 C.F.R. §
60-1.20(a)(1)(iii), not included in the "supporting documentation," 41 C.F.R. § 60-1.20(a)(1)(i),
requested by OFCCP in its initial scheduling letter, that additional information must be "supplied
by the contractor or otherwise gathered <u>during or pursuant to [an] on-site review</u>."  41 C.F.R. §
60-1.20(a)(1)(iii) (emphasis added).  Under United Space's interpretation of the regulatory
scheme, the "desk audit of . . . supporting documentation" that is described in 41 C.F.R. § 60-
1.20(a)(1)(i) comes to an end when OFCCP completes its analysis of the information that it
initially requested.  The company argues that any additional information that the agency might
wish to review must be collected pursuant to 41 C.F.R. § 60-1.20(a)(1)(ii)–(iii), both of which,
per United Space, describe procedures associated with an on-site agency visit.[6]

The agency, by contrast, argues that the regulations at issue here give it broad authority
to request "supporting documentation," 41 C.F.R. § 60-1.20(a)(1)(i), during the desk audit and
also to request "[w]here necessary, an off-site analysis of information supplied by the contractor
<u>or</u> otherwise gathered during or pursuant to [an] on-site review."  41 C.F.R. § 60-1.20(a)(1)(iii)
(emphasis added).  OFCCP points out that the terms "desk audit" and "supporting
documentation" are nowhere defined to limit the agency to a single request for particular
information.  Indeed, the agency notes that it has consistently maintained a contrary
interpretation.  *See, e.g.*, 71 Fed. Reg. 35, 124, 35, 125 (June 6, 2006).

In resolving these conflicting interpretations, this Court emphasizes that considerable
deference must be given to agency interpretations of their own regulations.  As the Supreme
Court has described it:

---

[6] As discussed below, the Fourth Amendment standard for on-site reviews is more
exacting than that which applies to an order to produce documents.

14

> We must give substantial deference to an agency's interpretation of its own regulations. *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 150–51 (1991); *Lyng v. Payne*, 476 U.S. 926, 939 (1986); *Udall v. Tallman*, 380 U.S. 1, 16 (1965). Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given "'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Ibid.* (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). In other words, we must defer to the Secretary's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988).
>
> > *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

United Space has articulated a plausible reading of the regulatory scheme—indeed, one which the Court might prefer if it were to interpret the regulatory text on a clean slate. But that is not the task at hand. The government has pointed to particular regulatory language that it plausibly interprets to confer the authority that it claims. Because this Court cannot say that the government's interpretation is plainly erroneous, it therefore finds that OFCCP had the authority under 41 C.F.R. § 60-1.20(a)(1) to make the data request that United Space challenges here. The Court goes on to consider whether any other agency regulations or policies prohibited the agency from acting as it did.[7]

### ii. OFCCP Authority to Analyze Item 11 Data

The "established maxim" that agencies must "adhere to their own rules," *Vietnam Veterans v. Sec'y of Navy*, 843 F.2d 528, 536 (D.C. Cir. 1988), masks considerable complexity in a simple phrase. An agency rule can be enforced against it in one of three distinct circumstances. First, a rule that has been announced in a formal regulation promulgated

---

[7] Because the Court concludes that OFCCP has authority to make the request at issue under 41 C.F.R. § 60-1.20(a)(1), it does not reach the agency's contention—which it raised for the first time at oral argument—that the request was also authorized by the "off-site review of records" provision. 41 C.F.R. § 60-1.20(a)(2).

pursuant to the notice-and-comment procedures required by Section 553 must be adhered to because, under what is known as the *Accardi* doctrine, "agencies may not violate their own rules and regulations to the prejudice of others." *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005); *see also IMS, P.C. v. Alvarez*, 129 F.3d 618, 621 (D.C. Cir. 1997) ("[I]t is a 'well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action.'") (quoting *Mine Reclamation Corp. v. FERC*, 30 F.3d 1519, 1524 (D.C. Cir. 1994)) (citations and internal quotation marks omitted in original). *Accardi* applies even to regulations which need never have been promulgated—sometimes called "gratuitous" regulations—because "'[a] court's duty to enforce an agency regulation [, while] most evident when compliance with the regulation in mandated by the Constitution or federal law,' embraces as well agency regulations that are not so required." *Lopez v. F.A.A.*, 318 F.3d 242, 247 (D.C. Cir. 2003) (quoting *United States v. Caceres*, 440 U.S. 741, 749 (1979)) (alterations in original).

Second, a rule that should have been put out for notice and comment but was not is nonetheless enforceable to the same extent as a properly-promulgated rule. *See Wilderness Soc. v. Norton*, 434 F.3d 584, 595–96 (D.C. Cir. 2006); *Chiron Corp. v. Nat'l Transp. Safety Bd.*, 198 F.3d 935, 943–44 (D.C. Cir. 1999). Rules to which the notice-and-comment requirement applies are often called "legislative rules." *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 34 (D.C. Cir. 2005). Legislative rules "create law," *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952), because they are "of present binding effect." *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988). Sections 553(b) and (c) of the APA require an agency to publish notice of such rules in the Federal Register. Notice and comment are not required, however, for "interpretative rules," "general statements of policy," or "rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(3)(A), which are commonly called

16

"procedural rules."

Though familiar, these classifications are nonetheless "tenuous," "fuzzy," and "baffling." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (quoting *Chisholm v. FCC*, 538 F.2d 349, 393 (D.C. Cir. 1976); *Pac. Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974); 2 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE 32 (2d ed. 1979)).  Yet the placement of administrative rules and policies into their proper categories remains a central judicial task.  A statement that is considered by the agency to be a general statement of policy or an interpretative rule—and therefore thought to be exempt from notice-and-comment proceedings under § 553—may actually function as a legislative rule.  If so, that improperly-issued rule is vulnerable to challenge for failure to conform with the notice-and-comment requirements of the APA.  When *the agency itself* wishes to avoid applying such a rule, however, a party may demand that a court enforce the rule against the agency as if it had been put out for notice and comment.  *Compare Vietnam Veterans*, 843 F.2d at 539 n.9 *with id.* at 537.  The question of enforceability thus collapses entirely into the question of categorization.  *See, e.g.*, *Wilderness Soc. v. Norton*, 434 F.3d 584, 595–96 (D.C. Cir. 2006) (analyzing whether a National Park Service policy is a legislative rule or statement of policy for the purposes of determining whether it is binding against the agency).  Despite "some suggestion in the case law that although an interpretative rule or statement of policy does not bind the courts or private parties, it may bind the agency itself," *Nat'l Latino Media Coal. v. FCC*, 816 F.2d 785, 788 n.2 (D.C. Cir 1987), the Court of Appeals has forcefully disclaimed that possibility.  "[S]tatements whose language, context and application suggest an intent to bind agency discretion and private party conduct—the sort of statements requiring compliance with § 553—will have that effect if valid; interpretative rules or policy statements will not *regardless* of their validity.  A binding policy is

17

an oxymoron." *Vietnam Veterans*, 843 F.2d at 537.

A procedural rule, however, may be enforceable against the agency in certain circumstances where it affects a party's rights. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."); *Chiron*, 198 F.3d at 944 ("Manuals or procedures may be binding on an agency when they affect individuals' rights."); *Mass. Fair Share v. Law Enforcement Assistance Admin.*, 758 F.2d 708, 711 (D.C. Cir. 1985) ("It has long been settled that a federal agency must adhere firmly to self-adopted rules by which the interests of others are to be regulated."); *Nat'l Small Shipments Traffic Conference, Inc. v. ICC*, 725 F.2d 1442, 1449 (D.C. Cir. 1984) (refusing to enforce a procedural rule against an agency where it "was not designed to protect either individual rights or wards of the federal government"). The Court of Appeals "has been careful to distinguish between procedural rules benefitting the agency . . . and procedural rules benefitting the party otherwise left unprotected by agency rules." *Lopez*, 318 F.3d at 247. Only that latter can be enforced against the agency. Procedural rules regarding an agency's treatment of its employees commonly fall within this category. *See Doe v. Hampton*, 566 F.2d 265, 280–81 (D.C. Cir. 1977) ("It is, of course, well-established that an agency must abide by its own regulations in effecting the removal of one of its employees.") (citing *Vitarelli v. Seaton*, 359 U.S. 535 (1959); *Service v. Dulles*, 354 U.S. 363 (1957); *Mazaleski v. Treusdell*, 562 F.2d 701 (D.C. Cir. 1977)). The Court of Appeals understands this line of cases regarding the enforceability of procedural rules to be entirely reconcilable with the cases concerning the enforceability of improperly promulgated legislative rules. *See Vietnam Veterans*, 843 F.2d at 538 ("[O]ur rule/policy exegesis is not inconsistent with the rule that agencies must follow their own procedures.") (citing *Morton*, 415 U.S. at 235); *id.* ("Internal procedures, like policy

18

statements, are exempt from the coverage of § 553.  The exemption is quite independent of whether the procedures will be binding.").

In sum, all legislative rules are binding against an agency, whether or not they have been properly promulgated under Section 553.  Procedural rules that affect individual rights are similarly binding.  United Space therefore argues that several OFCCP statements, taken together, amounted to either a legislative rule mandating the exclusive use of the standard threshold test to analyze the company's initial data submission, or a procedural rule that United Space is authorized to enforce against the agency.  OFCCP responds that the statements at issue were general statements of policy or procedural rules that did not affect the company's rights.  Before the Court can analyze those arguments, it must first review the agency documents on which they are based.

Executive Order 11246 authorizes the Secretary of Labor or her designee to "investigate the employment practices of any Government contractor or subcontractor . . . to determine whether or not the contractual provisions specified in Section 202 of this Order have been violated."  Exec. Order No. 11246, § 206(a).  As noted above, Section 202 mandates, among other things, that contractors agree that they "will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin," and "will furnish all information and reports required by [the executive order] and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to [the contractor's] books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders."  *Id.* § 202.  The investigations authorized by Section 206 "shall be conducted in accordance with the procedures established by the Secretary of Labor" or her designee.  *Id.* §

206(a).

As described above, the regulations implementing Executive Order 11246 authorize OFCCP to conduct a compliance evaluation of any covered contractor "to determine if the contractor maintains nondiscriminatory hiring and employment practices." 41 C.F.R. § 60-1.20(a). These evaluations may take the form of a "compliance review," which can itself involve a "desk audit" in which OFCCP analyzes contractor-provided data at its own office, an on-site review conducted at the contractor's establishment, *id.* § 60-1.20(a)(1)(i)-(ii), "an off-site analysis of information supplied by the contractor or otherwise gathered during or pursuant to the on-site review," *id.* § 60-1.20(a)(1)(iii), or all three. *Id.* § 60-1.20(a)(1).

OFCCP described its procedure for conducting desk audits in the Federal Register. Discussed above, the publication entitled "Interpreting Nondiscrimination Requirements of Executive Order 11246 with Respect to Systemic Compensation Discrimination" describes when OFCCP will make a finding of compensation discrimination and issue a notice of violation. 71 Fed. Reg. 35,124 (June 16, 2006). It also discusses the "tiered-review approach" that OFCCP follows when analyzing the Item 11 compensation data submitted by federal contractors.

> Once it receives [a contractor's] Item 11 data, OFCCP conducts a simple comparison of group average compensation by pay grade or other aggregation unit by which the employer has provided the data. If this comparison indicates a significant disparity, OFCCP will ask the contractor for employee-specific compensation and personnel information.
>
> 71 Fed. Reg. at 35,125.

At the time relevant to this suit OFCCP had also posted to its website a Frequently Asked Question addressing the agency's desk audit practices. The FAQ read as follows:

### Has OFCCP developed procedures for conducting a desk audit of a contractor's compensation practices?

Each of OFCCP's regional offices uses the same basic procedures for conducting a

desk audit review of a contractor's compensation practices.  Generally speaking, during a desk audit, the agency will examine the following three criteria when evaluating a contractor's compensation practices:

- Whether, for at least one pay division, there is a specified difference in average compensation between the two groups being compared and, if so, whether at least one group appears to be adversely affected.

- After combining the pay divisions meeting the above condition, whether the number of employees in the non-favored group is greater than a specified number and represents a specified percentage of the total employees in that group in the overall workforce.

- Whether the overall percentage of the group most adversely affected in the combined pay divisions is larger, by a specified amount, than the overall percentage of the other groups adversely affected.

The specified thresholds used in each of the three criteria above are not static, but rather are subject to change as OFCCP continues to evaluate its targeting methodology.

AR 1165.

Also at the time relevant to this suit, OFCCP had issued an internal directive "[t]o outline the process and procedure for conducting non-construction compliance evaluations."  AR 1146. The directive, which was published on the OFCCP website, describes a system known as "active case management" or "ACM," the "chief purpose" of which was "to concentrate Agency resources on identifying and remedying cases of systemic discrimination, thereby enabling the Agency to use its resources in a more effective and efficient manner.  ACM also aim[ed] to quickly and efficiently close out reviews where there are no indicators of systemic discrimination present."  *Id.*  One of the "specific procedures for ACM," was that "the contractor's personnel activity and compensation data [would] be analyzed for possible systemic discrimination indicators."  AR 1147.  In conducting that analysis, OFCCP officials were to "[f]ollow FCCM 2O and 2P as amended by the April 23, 2007 Directive entitled 'Analysis of Contractor Compensation Practices at the Desk Audit Stage of a Compliance Evaluation.'"  *Id.*

The April 23, 2007 directive ("2007 Directive") in turn, notes that OFCCP "has not issued formal guidelines for analyzing contractor compensation practices during a desk audit." 2007 Directive at 1.  It "seeks to remedy that situation by promulgating uniform standards for evaluating the compensation data provided by a contractor in response to Item No. 11 of the Scheduling Letter."  *Id.* at 1–2.  The directive "transmits internal procedures for analyzing contractor compensation practices and requesting additional compensation data during the desk audit stage of a compliance evaluation."  *Id.* at 3.  It states that "[t]he procedures set forth in this Notice must be performed on all non-administrative case closures."  *Id.*  The directive further provides that an OFCCP compliance officer "will use the **Desk Audit Compensation Indicator Determination Spreadsheet** . . . to conduct the initial desk audit compensation analysis.  The spreadsheet will assist the [compliance officer] in identifying a compensation disparity indicator for the establishment as a whole or for a specified subset of the workforce . . . through a series of calculations."  *Id.* at 6.  This spreadsheet contained the "threshold analysis," which the directive describes in terms very similar to those used in the Frequently Asked Question.  *See id.* at 6–7. The 2007 Directive states that:

> The Desk Audit Compensation Indicator Determination Spreadsheet will reveal potential compensation discrimination indicators requiring further review of a contractor's submitted Item No. 11 data only when **all** of the following conditions are met:

> (1)   For at least one pay division there is a difference of [REDACTED] **percent** or more in average compensation between the groups being compared and at least one group appears to be adversely affected.

> *Id.*

A footnote following that sentence reads:

> For purposes of screening, OFCCP will calculate the wage disparity percentage by dividing the difference in the average pay rates between the groups being compared by the average salary of the favored groups and

multiplying this value by [REDACTED].  For example, if the average salary for the females in a pay division is [REDACTED] and the average salary for males in the same division is [REDACTED], then OFCCP will compute the percentage difference by dividing the average difference in salaries by the average salary of the favored group ([CALCULATION REDACTED]) and multiplying this value by [REDACTED] ([CALCULATION REDACTED]) to yield a percentage value of [REDACTED] percent.

*Id.* at 6 n.4.

Following a clarification not relevant here, the directive goes on:

(2)    After combining the pay divisions meeting condition (1), the number of employees in the non-favored group is at **least [REDACTED] and represents at least [REDACTED] percent of the total employees in that group in the overall workforce.**

(3)    The overall percentage of the group most adversely affected in the combined pay divisions must be at least **[REDACTED] times** greater than the overall percentage of the other groups adversely affected.

*Id.* at 7.

After providing an illustrative example, the directive summarizes as follows:

Under the desk audit compensation indicator determination spreadsheet criteria, the number of affected individuals affected must be high (at least [REDACTED]) and the percentage of the non-favored workforce affected must be substantial ([REDACTED] or higher) for the investigation to continue.  Furthermore, the disparity in compensation between favored and non-favored groups must be significant ([REDACTED] or higher).  These requirements are intended to identify potential broad-based compensation problems that warrant more in-depth investigation by OFCCP.

*Id.* at 9–10.

Here a footnote reads:

OFCCP may elect to change any or all of the threshold criteria at a later date upon further evaluation.  The Desk Audit Compensation Indicator Determination Spreadsheet is intended to serve as a screening tool to better identify systemic compensation discrimination practices.  In some cases, even if an overall indicator is not established, further review will be warranted where other evidence of discrimination exists, such as direct or circumstantial evidence that gender, race, or ethnicity played a role in setting compensation.

*Id.* at 10 n.6.

The directive goes on:

23

Because this set of criteria yields an overall outcome for the case, rather than specific indicators for each pay division, the indicator provides the basis for a request for additional data for the entire workforce (or an appropriately defined broad subset).

. . .

If the desk audit does not indicate potential compensation discrimination, the compensation review portion of the compliance evaluation should be closed. However, where OFCCP has anecdotal evidence that suggests a pattern or practice of compensation discrimination, the region may continue the analysis of a contractor's compensation practices with the written approval of the Director of Program Operations.

*Id.* at 10.

The 2007 Directive was not produced in the administrative hearing and is not part of the administrative record. Before this Court can evaluate whether OFCCP has committed itself to the exclusive use of the threshold test described in that directive, it must first decide whether it can properly consider the directive at all. The agency argues that because the APA instructs courts to review "the whole record or those parts of it cited by a party," 5 U.S.C. § 706, the Court should not consider a document that does not appear in the administrative record. But the whole record requirement does not sweep so broadly.

As the Court of Appeals has explained, in order "to review an agency's action fairly" a court "should have before it neither more nor less information than did the agency when it made its decision." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984); *see also Am. Radio Relay League, Inc. v. F.C.C.*, 524 F.3d 227, 243 (D.C. Cir. 2008) (same); *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997) (same) (both quoting *Heckler*, 749 F.2d at 792). "To review less than the full administrative record might allow a party to withhold evidence unfavorable to its case, and so the APA requires review of 'the whole record.'" *Heckler*, 749 F.2d at 792 (quoting 5 U.S.C. § 706); *see also id.* ("The requirement of review

upon 'the whole record' means that courts may not look only to the case presented by one party, since other evidence may weaken or even indisputably destroy that case.") (quoting S. Rep. No. 79-752, at 28 (1945) and H.R. Rep. No. 79-1980, at 46 (1946)).  On the other hand, "[t]o review more than the information before the Secretary at the time she made her decision risks our requiring administrators to be prescient or allowing them to take advantage of post hoc rationalizations." *Heckler*, 749 F.2d at 792.  For that reason, "[o]rdinarily, judicial review of informal agency rule-making is confined to the administrative record; neither party is entitled to supplement that record with litigation affidavits or other evidentiary material that was not before the agency." *Edison Elec. Inst. v. OSHA*, 849 F.2d 611, 617–18 (D.C. Cir. 1988); *see also Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 286 (D.C. Cir. 1981) ("There is no occasion for a judicial probe beyond the confines of a record which affords enough explanation to indicate whether the agency considered all relevant factors.").  "When the record is inadequate," however, "a court may 'obtain from the agency, either through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary.'" *Costle*, 657 F.2d at 285 (quoting *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973) (per curiam)); *see also id.* at 286 ("If anything, a judicial venture outside the record can only serve either as background information, or to determine the presence of the requisite fullness of the reasons given . . . .") (internal citations omitted). "[S]upplementing the administrative record might be proper," for example, "'if petitioners made a prima facie showing that the agency excluded from the record evidence adverse to its position.'"  *Kent Cty., Del. Levy Court v. EPA*, 963 F.2d 391, 396 (D.C. Cir. 1992) (quoting *San Luis Obispo Mothers for Peace v. NRC*, 751 F.2d 1287, 1327 (D.C. Cir. 1984), *vacated in another part*, 760 F.2d 1320 (D.C. Cir. 1985) (en banc), *and aff'd*, 789 F.2d 26 (D.C. Cir. 1986) (en banc)).

As these cases suggest, the APA requirement of review on "the whole record" concerns the types of evidence or information that a court may use to evaluate the rationality of agency decision-making.  In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), the Supreme Court cited to the "whole record" requirement in disallowing judicial review based upon litigation affidavits.  *Id.* at 419–20.  In *Camp v. Pitts*, 411 U.S. 138 (1973), the Court overturned a remand order that would have allowed the parties "to make an evidentiary record before the District Court" and have given a permit applicant the chance to introduce "any other relevant evidence" in support of its application.  *Id.* at 142 (per curiam) (internal quotation marks omitted).  In *IMS, P.C. v. Alvarez*, 129 F.3d 618 (D.C. Cir. 1997), the Court of Appeals upheld the district court's decision to strike four litigation affidavits that "contain[ed] information that should have been submitted to the agency before this dispute reached the courts."  *Id.* at 624.  Indeed, the Court of Appeals has "repeatedly applied [the 'whole record' rule] to bar introduction of litigation affidavits to supplement the administrative record."  *AT&T Info. Sys., Inc. v. Gen'l Servs. Admin.*, 810 F.2d 1233, 1236 (D.C. Cir. 1987) (per curiam) (citing *Heckler*, 749 F.2d at 792–94; *Costle*, 657 F.2d at 285–86 (D.C. Cir. 1981); *Rodway v. U.S. Dep't of Agric.*, 514 F.2d 809, 816 (D.C. Cir. 1975)).

The 2007 Directive, however, is not "post-hoc evidence," *see Edison Elec. Inst. v. OSHA*, 849 F.2d 611, 617 (D.C. Cir. 1988) (internal quotation marks omitted), that "should have been submitted to the agency before this dispute reached the courts."  *IMS*, 129 F.3d at 624.  It does not offer an alternative explanation of the relevant facts or the agency's reasoning.  *Cf. Pitts*, 411 U.S. at 142–43.  Instead, the Directive is an internal agency document that was actually considered by the official who first requested additional data from United Space.  Although "[w]e base our review of the [agency's] actions on the materials that were before the [agency] at

26

the time its decision was made," *Puerto Rico Higher Educ. Assistance Corp. v. Riley*, 10 F.3d 847, 850–51 (D.C. Cir. 1993), it can hardly be said that the agency's own directive was not before it.

Having concluded that the 2007 Directive is in fact before us, the Court must now consider whether it or any other OFCCP document commits the agency to the exclusive use of the threshold analysis described therein.  The Court of Appeals has identified two lines of inquiry which guide it in determining whether an agency statement is a legislative rule that binds the agency:

> One line of analysis focuses on the effects of the agency action, asking whether the agency has (1) imposed any rights and obligations, or (2) genuinely left the agency and its decisionmakers free to exercise discretion.  The language actually used by the agency is often central to making such determinations.  The second line of analysis focuses on the agency's expressed intentions.  The analysis under this line of cases looks to three factors: (1) the agency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency.
>
> *Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006)
> (internal citations, quotation marks, and brackets omitted).

United Space argues that, read as a coherent whole, Executive Order 11246, its implementing regulations, and the agency documents described above bind OFCCP to the use of the threshold analysis described in the 2007 Directive and only that analysis as the basis for its decisions to request additional compensation information.  OFCCP responds that the agency statements preserve the agency's discretion to use other modes of analysis.  The government's argument is persuasive.

United Space emphasizes the instances of mandatory language in the documents.  First, the text of the executive order states that investigations "*shall* be conducted in accordance with the procedures established by the Secretary of Labor" or her designee.  Exec. Order No. 11246, §

206(a) (emphasis added).  The discussion of comments on the compensation discrimination standards states that "OFCCP *will* ask the contractor for employee-specific compensation and personnel information" when the initial data analysis "indicates a *significant* disparity."  71 Fed. Reg. at 35,125 (emphases added).  The publicly-available Frequently Asked Question closely corresponds to the 2007 Directive, which states that OFCCP personnel "will" use the threshold analysis, 2007 Directive at 6, and provides that under that analysis "the number of affected individuals *must* be high" and "the disparity in compensation between favored and non-favored groups *must* be significant" for there to be an indication of potential compensation discrimination.  *Id.* at 9 (emphases added).

OFCCP, by contrast, emphasizes the ways in which the statements on which United Space relies in fact suggest that the agency remains free to exercise its discretion.  OFCCP notes that the compensation discrimination standards published in the Federal Register were promulgated to limit the bases on which the agency could issue a notice of violation, and only discuss the desk audit procedures by way of background.  Moreover, the agency argues, as that document does not define "significant disparity" there is no reason to think that it refers only to the threshold test.  *See* 71 Fed. Reg. at 35,125.  With respect to the Frequently Asked Question on the agency website, OFCCP notes that it describes the threshold analysis as the procedure which, "[g]enerally speaking," the agency follows, and includes the caveat that "[t]he specific thresholds . . . are not static, but rather are subject to change as OFCCP continues to evaluate its targeting methodology."  AR 1165.  OFCCP points out that the active case management directive contains a reservation of agency discretion, *see* AR 1148 n.7, and that the 2007 Directive states both that "OFCCP may elect to change any or all of the threshold criteria at a later date upon further evaluation," and that "[i]n some cases, even if an overall indicator is not

established, further review will be warranted where other evidence of discrimination exists, such as direct or circumstantial evidence that gender, race or ethnicity played a role in setting compensation." 2007 Directive at 10 n.6. In a related argument, and for similar reasons, OFCCP maintains that its statements do not create any rights in federal contractors that are enforceable under *Morton v. Ruiz*, 415 U.S. 199 (1974) and its progeny.

OFCCP offers a persuasive account of its policies. The mandatory language on which United Space relies cannot overcome the agency's clear reservations of authority in its own internal documents. Although "mandatory language suggests the 'rigor of a rule, not the pliancy of a policy,' the . . . use of these words cannot be read in isolation." *Ctr. for Auto Safety, Inc. v. Nat'l Hwy. Traffic Safety Admin.*, 342 F. Supp. 2d 1, 17–18 (D.D.C. 2004), *aff'd* 452 F.3d 798 (D.C. Cir. 2006) (quoting *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320–21 (D.C. Cir. 1988)). The general rule is that "internal house-keeping measures organizing agency activities" are non-binding statements of general policy. *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980). Except in unusual circumstances, "the internal procedures manual of an executive agency does not create due process rights in the public." *Lynch v. U.S. Parole Comm'n*, 768 F.2d 491, 497 (2d Cir. 1985). Although "manuals or procedures may be binding on an agency where they affect individuals' rights," *Chiron Corp. v. NTSB*, 198 F.3d 935, 944 (D.C. Cir. 1999), the cases finding such documents to be binding have involved the rights of agency employees, *see, e.g.*, *Doe v. Hampton*, 566 F.2d 265, 280–81 (D.C. Cir. 1977), or beneficiaries of government programs. *Morton v. Ruiz*, 415 U.S. 199, 231–37 (1974). No comparable right—indeed, no right at all—is at issue here.

Moreover, when determining whether an internal agency document is binding, the Court of Appeals has considered it "particularly noteworthy," *Wilderness Soc. v. Norton*, 434 F.3d 584,

29

595 (D.C. Cir. 2006), that it was not issued through notice-and-comment rulemaking nor published in the Federal Register, because "[f]ailure to publish in the Federal Register is an indication that the statement[s] in question [were] not meant to be . . . regulation[s]." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538–39 (D.C. Cir. 1986).  The threshold analysis was never issued in any formal, public pronouncement that evidenced an intent to bind the agency.

Even if the agency intended to be bound to the 2007 Directive, the language of that directive only requires that OFCCP perform the threshold analysis.  It nowhere forbids the agency from also performing other analyses.  When the 2007 Directive states that "[i]f the desk audit does not indicate potential compensation discrimination, the compensation review portion of the compliance evaluation should be closed," 2007 Directive at 10, it does not limit the meaning of "desk audit" to "threshold test" as it does elsewhere, *see id.* at 6–7 (referring to the results of the "Desk Audit Compensation Indicator Determination Spreadsheet"), and it does not say that the compensation review portion of the compliance evaluation *must* be closed. For these reasons, as well as those discussed above, the Court concludes that OFCCP's reliance on analyses other than the threshold test was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).

### B.  Fourth Amendment

United Space next argues that the OFCCP request for additional data violated the Fourth Amendment prohibition against unreasonable searches and seizures.[8]  This constitutional

---

[8] Although OFCCP made the request at issue in this case in an attempt to enforce the contractual provisions mandated by Executive Order 11246, the agency does not contest United Space's claim that the Fourth Amendment rather than ordinary contract principles governs the Court's analysis.  The agency suggests that the weight of judicial authority supports a

protection applies to administrative inspections as well as criminal investigations.  *Camara v. Municipal Court*, 387 U.S. 523, 534 (1967).  It extends to places of business as well as private homes.  *See v. City of Seattle*, 387 U.S. 541, 545 (1967).  Administrative warrants and subpoenas must both comport with the Fourth Amendment, although different standards apply to each.  For an administrative warrant to issue, the government must have either "specific evidence of an existing violation" or the ability to show that "reasonable legislative or administrative standards" such as "a general administrative plan . . . derived from neutral sources" justify the warrant.  *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320, 321 (1978) (internal quotation marks omitted).  Such a showing satisfies the constitutional requirement that "no Warrants shall issue, but upon probable cause," U.S. CONST. amend. IV, however "[p]robable cause in the criminal law sense is not required" to justify an administrative warrant.  *Barlow's*, 436 U.S. at 320.  The standard set out in *Barlow's* applies whenever "government inspectors [attempt] to make nonconsensual entries into areas not open to the public," *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984), and ensures that "the decision to enter and inspect will not be the product of the unreviewed discretion of the enforcement officer in the field."  *See*, 387 U.S. at 545.

"[T]he enforceability of [an] administrative subpoena," on the other hand, "is governed, not by [the Court's] decision in *Barlow's* . . . but rather by [its] decision in *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186 (1946)."  *Lone Steer*, 464 U.S. at 414.  Under *Oklahoma*

---

presumption that United Space contractually consented "only to searches that comport with constitutional standards of reasonableness."  *United States v. Harris Methodist Fort Worth*, 970 F.2d 94, 100 (5th Cir. 1992) (evaluation of compliance with Title VI); *see also First Ala. Bank v. Donovan*, 692 F.2d 714, 720 (11th Cir. 1982) (holding that, by signing a contract incorporating the relevant portions of Executive Order 11246, a federal contractor consented "only to those [compliance] reviews which employ reasonable searches as that term is defined under the Fourth Amendment.").  Because the parties do not contest the question, the Court assumes their view without deciding the issue.

*Press* and its progeny, "when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *Id.* at 415 (quoting *See*, 387 U.S. at 544).  This line of cases holds administrative subpoenas to a considerably lower standard than administrative warrants—a standard that notably focuses on the breadth of the subpoena rather than the motivation for its issuance.  *See United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) ("Even if one were to regard the request for information . . . as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest.").  "The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable." *Id.* at 652–53 (1950) (quoting *Oklahoma Press*, 327 U.S. at 328); *see also Lone Steer*, 464 U.S. at 415.  This line of cases "in no way leaves an employer defenseless against an unreasonably burdensome administrative subpoena requiring the production of documents." *Lone Steer*, 464 U.S. at 415.  Rather, it "provide[s] protection for a subpoenaed employer by allowing him to question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it, by raising objections in an action in district court." *Id.*

United Space argues that the order at issue in this case is effectively an administrative warrant, which should be tested under *Barlow's* and found unconstitutional.  The government contends that the order, though not technically an administrative subpoena, is practically identical to one and should therefore be tested under *Lone Steer* and upheld.  Its argument is persuasive.

United Space first argues waiver.  It maintains that this court should evaluate the

administrative order under *Barlow's* because the administrative law judge did so and the government has waived any argument against the applicability of that standard.  OFCCP explains that because it was arguing for an order that United Space comply with an on-site review of documents, it attempted to meet the higher constitutional standard that such an order would require.  Although OFCCP would have been well advised to explicitly defend its request for documents before the administrative law judge under the lower standard that it now wishes to apply to that request, its failure to do so did not waive the argument that it now makes before this Court.  At the hearing before the administrative law judge, OFCCP defended its proposed order under the standard necessary to justify the entirety of that order.  The Administrative Review Board did not order an on-site inspection, but there is no reason that, having lost its argument on that count, the government should now be forced to argue as though it had won.

On the merits of the question, United Space argues that this administrative order for the production of documents cannot be treated as a subpoena because OFCCP lacks subpoena authority and because the order cannot be immediately challenged in an Article III court.  The agency concedes that it lacks formal subpoena authority, but posits that the order is indistinguishable from an administrative subpoena and should therefore be treated as one.  The Supreme Court has explained that the central distinction between administrative warrants and administrative subpoenas—and therefore between cases in which the Fourth Amendment requires probable cause under *Barlow's* or mere reasonableness under *Lone Steer*—is that only warrants authorize "nonconsensual entries into areas not open to the public." *See Lone Steer*, 464 U.S. at 414.  The order under review here does not authorize entry onto private areas of United Space property, and so it is properly tested under *Lone Steer*.

United Space's arguments to the contrary are unavailing.  To say that this order cannot be

a subpoena because the agency lacks subpoena authority does not suggest, as United Space argues, that the order is therefore a warrant. The order must be evaluated under either *Barlow's* or *Lone Steer*; United Space does not suggest a third test that the Court could apply, but simply argues that anything that is not formally a subpoena must be supported by probable cause. The Court is not persuaded. United Space further objects that an OFCCP official's request for information cannot be immediately challenged in an Article III court, as a subpoena can. Here it is mistaken about what constitutes the "final agency action" presently under review. As discussed above, this Court reviews the agency's final administrative order that United Space comply with the OFCCP data request—and not the original request itself. "[B]efore suffering any penalties for refusing to comply with" that order, United Space can "question [its] reasonableness . . . by raising objections in an action in district court." *Lone Steer*, 464 U.S. at 415. Indeed, it has done so, and the Court reviews its constitutional arguments as though presented here for the first time. The Fourth Amendment requires no more.

Finally, the authorities that United Space cites for the claim that courts have evaluated similar orders under the *Barlow's* standard are not persuasive. United Space cites *Beverly Enterprises, Inc. v. Herman*, 130 F. Supp. 2d 1 (D.D.C. 2000), which properly applied the *Barlow's* standard to an OFCCP inspection of the contractor's "files and headquarters." *Id.* at 4. An inspection of a contractor's headquarters is clearly an on-site inspection of non-public areas, and the *Beverly* court was right to hold such an order to the *Barlow's* standard. United Space also cites two cases decided before *Lone Steer* reaffirmed the continuing viability of the *Oklahoma Press* line of cases regarding administrative subpoenas. *See First Ala. Bank v. Donovan*, 692 F.2d 714, 721 (11th Cir. 1982); *United States v. Miss. Power & Light Co.*, 638 F.2d 899, 908 (5th Cir. 1981). At oral argument, the government represented to this Court that

OFCCP investigations in that era routinely included the on-site inspection of records, which would provide an additional reason for those cases to have applied *Barlow's*.  In any event, those authorities are merely persuasive, and this Court is not persuaded that an order which does not provide for "nonconsensual entries into areas not open to the public," *Lone Steer, Inc.*, 464 U.S. at 414, should be tested as though it did.  This Court therefore concludes that the order should be evaluated under the Fourth Amendment standard set out in *Lone Steer*.  An order that United Space produce eighteen items of individualized compensation data for a single facility is "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *Id.* at 415.  The agency's action was therefore in accordance with the Fourth Amendment.

United Space's argument that the initial OFCCP request for compensation information violated the Fourth Amendment is equally unavailing, because (as the administrative law judge found, AR 557–58) the company consented to that request.  Consent "is a question of fact to be determined from the totality of all the circumstances."  *United States v. Black*, 675 F.2d 129, 138 (7th Cir. 1982).  The administrative law judge's finding of consent must therefore be affirmed if it is supported by substantial evidence.  *Beverly*, 130 F. Supp. 2d at 13; *see also United States v. Canales*, 572 F.2d 1182, 1188 (6th Cir. 1978) (appellate tribunal reviewing finding of consent under substantial evidence standard in the criminal context); *United States v. Brown*, 540 F.2d 1048, 1055 (10th Cir. 1976) (same).  The administrative law judge's conclusion that by voluntarily responding to the initial OFCCP request United Space manifested its consent to that request is supported by substantial evidence.  As the administrative law judge noted, United Space was familiar with the OFCCP compliance review process and was aware that it could refuse to comply with a data request, as evidenced by its refusal to comply with the second

OFCCP request.  The administrative law judge's conclusion that United Space's response to the initial desk audit was an indication of its voluntary consent was therefore supported by substantial evidence.  United Space's arguments to the contrary are unavailing.  The company first argues that it would only have consented to the information request if the company had been selected on a neutral basis, but United Space never expressed such a reservation.  In the alternative, United Space argues that its consent was procured through misrepresentation.  The company cites to *Bumper v. North Carolina*, 391 U.S. 543 (1968), in which the Supreme Court held that "there can be no consent" to a search when "that 'consent' has been given only after the official conducting the search has asserted that he possesses a warrant."  *Id. at* 548.  However, there is no evidence that OFCCP did anything more than cite to its statutory and regulatory authority to make the initial data request.  Those citations were neither deceptive nor coercive. *See Lake Butler Apparel Co. v. Sec'y of Labor*, 519 F.2d 84, 88 n.14 (5th Cir. 1975) (finding consent where an agency official "presented himself at the plant in the same manner as might any other government official and the [company] had the same right of refusal" but nonetheless permitted access to its facility).  United Space has not offered any evidence of other agency deception or coercion.

### C.  Paperwork Reduction Act

The Paperwork Reduction Act, 44 U.S.C. §§ 3501–21, gives the Office of Management and Budget the responsibility for ensuring that certain agency information requests are not unduly burdensome.  When that office approves a covered request, it issues a control number to the agency.  "Notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information that is subject to this subchapter . . . if . . . the collection of information does not display a valid control number assigned by" the

Office of Management and Budget.  44 U.S.C. § 3512(a).  Under this provision and as relevant

here, a collection of information consists of "answers to identical questions posed to, or identical

reporting or recordkeeping requirements imposed on, ten or more persons."  44 U.S.C. §

3502(3)(A)(1).  However, a control number is not required for information requests made during

"an administrative action or investigation involving an agency against specific individuals or

entities."  44 U.S.C. § 3518(c)(1)(B)(ii).  United Space argues that because the Orlando OFCCP

office regularly requests additional data when conducting desk audits, and often requests the

same additional information, its request of additional United Space compensation information

was a "general investigation[] undertaken with reference to a category of . . . entities," 44 U.S.C.

§ 3518(c)(1), rather than an "investigation . . . against specific individuals or entities."  44 U.S.C.

§ 3518(c)(1)(B)(ii).

As OFCCP argues, the plain language of the statute suggests otherwise.  The agency's

request for additional data was triggered by its analysis of the initial United Space submission; it

was not part of a request made to an entire category of entities.  To say that the relevant

"category of entities" was federal contractors with pay disparities in their initial data submissions

would render the exception for investigations against individuals nearly meaningless, because all

individual investigations are triggered by some standard that can be expressed in general terms.

To hold otherwise would "limit [OFCCP] in a way that would seriously curtail its investigative

efforts and in a way that Congress never intended in passing" the Paperwork Reduction Act.

*Shell Oil Co. v. Babbitt*, 945 F. Supp. 792, 807 (D. Del. 1996).  Courts of Appeals have held that

the Paperwork Reduction Act does not apply to document requests made during an audit by the

Minerals Management Service, *Phillips Petroleum Co. v. Lujan*, 963 F.2d 1380, 1387 (10th Cir.

1992), nor to tax summonses issued by the Internal Revenue Service.  *United States v. Saunders*,

951 F.2d 1065, 1066–67 (9th Cir. 1991).  The question under 44 U.S.C. § 3518(c)(2) is not

whether many individual contractors receive requests for additional compensation data during

OFCCP audits, nor whether OFCCP often uses the same template to make those follow-up

requests.  *See Pitts v. C.I.R.*, 2010 WL 1838282, at *11 (Tax Ct. May 6, 2010).  Rather, the

question posed by the statute is whether this particular request was a "general investigation."  It

was not.

### D.  Fifth Amendment

### i.  Expedited hearing procedures and adverse discovery rulings

United Space argues that it was denied due process by a number of the administrative law

judge's discovery and evidentiary rulings, which were made pursuant to the expedited hearing

procedures authorized by 41 C.F.R. § 60-30.31.  The constitutionality of those procedures was

analyzed at length and persuasively in *Beverly Enterprises v. Herman*, 130 F. Supp. 2d 1 (D.D.C.

2000).  Judge Urbina held in *Beverly* that OFCCP expedited hearings respect the due process

rights of federal contractors, and this Court agrees.

"Due Process is flexible and calls for such procedural protections as the particular

situation demands."  *Id.* at 17 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)).

"'Though the required procedures may vary according to the interests at stake in a particular

context,' '[t]he fundamental requirement of due process is the opportunity to be heard "at a

meaningful time and in a meaningful manner."'"  *Kropat v. FAA*, 162 F.2d 129, 132 (D.C. Cir.

1998) (quoting *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 261 (1987), and *Mathews*, 424

U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965))).  The Court of Appeals

"has made clear that the Fifth Amendment 'only requires that a person receive his "due" process,

not every procedural device that he may claim or desire.'"  *Id.* (quoting *Johnson v. United States*,

628 F.2d 187, 194 (D.C. Cir. 1980)).  "To establish an actionable due process claim, the plaintiff

must show (1) it has a constitutionally protected life, liberty or property interest and (2) the

procedures employed deprived the plaintiff of that interest without constitutionally adequate

procedure."  *Beverly*, 130 F. Supp. 2d at 17 (citing *Propert v. District of Columbia*, 948 F.2d

1327, 1331 (D.C. Cir. 1991), *Soeken v. Herman*, 35 F. Supp. 2d 99, 104–05 (D.D.C. 1999)); *see

also Kropat*, 162 F.2d at 132–33.

As Judge Urbina recognized in *Beverly*, federal contractors have a legitimate interest in

the privacy of their records.  *See Beverly*, 130 F. Supp. 2d at 17 (citing *New York v. Burger*, 482

U.S. 691, 699–700 (1987); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312–13 (1978)).  The

strength of that interest must be weighed in tandem with the risk that a contractor will be

erroneously deprived of its privacy under the expedited procedures and the government's interest

in upholding the challenged procedures and avoiding the burden of additional procedures.  *See

id.* ("To decide how much procedural protection is necessary, the court must balance three

factors: (1) the strength of the plaintiff's privacy interest that will be affected by the official

action; (2) the risk of an erroneous deprivation of the plaintiff's privacy interest under the

disputed procedures and (3) the government's interest in maintaining the procedures at issue,

including avoiding the burden that additional procedures would place on its resources.") (citing

*Kropat*, 162 F.2d at 132–33).

Judge Urbina balanced the contractor's interest in the privacy in its records—which, as

he noted, is weaker for commercial records than it is for personal ones, and further weakened by

the contractual basis of the request—against the government's interest in having its contractual

rights enforced at a reasonable cost and in a reasonable timeframe.  He concluded that, because

the expedited procedures provide contractors with the rights to counsel, to a neutral arbitrator, to

present evidence and witnesses, and to rebut and cross-examine the evidence and witnesses put forward by the government, they satisfy the requirements of due process.  *See id.* 18–20.  This Court agrees.

As in *Beverly* and the cases discussed therein, the petitioner here alleges that its inability to conduct all of the discovery that it wished amounted to a denial of due process.  United Space challenges the administrative law judge's refusal (1) to order the production of the original spreadsheets used by Miguel Rivera to analyze the United Space compensation data, (2) to require the testimony of Andrew Teresi, the OFCCP compliance officer who initially analyzed the United Space data, (3) to order OFCCP to respond to United Space requests for admission, and (4) to allow the introduction of studies regarding the pay gap between men and women in the national workforce.[9]  Once the constitutionality of the overall administrative proceeding has been established, a court reviews an agency's discovery rulings with "extreme deference."  *Hi-Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 789 (D.C. Cir. 2000).  None of United Space's objections to the discovery rulings of the administrative law judge overcome the deference that the Court accords those rulings.  The spreadsheets were not produced because they contained the ratios that OFCCP has redacted from the threshold test.  Mr. Teresi was not required to testify because the administrative law judge found that his testimony would be redundant given the testimony of Miguel Rivera.  OFCCP was not required to respond to the United Space requests for admission because those requests were served such that responses would have been due after the date of the hearing.  Finally, the excluded studies were beyond the scope of the issues

---

[9] United Space also objects to the administrative law judge's refusal to order the production of the 2007 Directive.  The Court considers that objection moot because the directive has been produced and considered in this action.

properly presented at the administrative hearing.  None of these rulings denied United Space any process that was constitutionally due to the company.

### ii.  Notice

United Space next argues that OFCCP denied the company due process of law by failing to provide notice of the "pattern analysis" that the agency performed upon United Space Item 11 data.  The Court of Appeals has said that "[w]here . . . a party first receives actual notice of a proscribed activity through a citation, it implicates the Due Process Clause of the Fifth Amendment."  *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1088 (D.C. Cir. 2007) (citing *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 158 (1991) (noting that "the decision to use a citation as the initial means for announcing a particular interpretation may bear on the adequacy of the notice to regulated parties")).  In this case, however, United Space has received no citation and OFCCP has announced no newly proscribed activity.  The proscribed activity—employment discrimination by federal contractors—has remained unchanged for many years.  Only the methods by which OFCCP investigates possible instances of such discrimination are at issue here.  Nor is this a case where "after a good-faith review of 'the regulations and other public statements issued by the agency, a regulated party acting in good faith' would not be able 'to identify, with ascertainable certainty, the standards with which the agency expects parties to conform.'"  *Fabi*, 508 F.3d at 1089 (quoting *AJP Constr. Co. v. Sec'y of Labor*, 357 F.3d 70, 76 (D.C. Cir. 2004) (quoting *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995))).  OFCCP expects United Space not to discriminate among its employees on the basis of any protected class characteristic, but it has not accused United Space of such discriminatory activity—and it has no announced no new interpretation of what constitutes discrimination.  There is no constitutional requirement that United Space be given notice of the

ways in which OFCCP will investigate potential instances of discrimination.

### iii.  Equal Protection

United Space next argues that the OFCCP data request violated the equal protection guarantee of the Fifth Amendment.  The essence of the company's argument is that the pay disparities observed by OFCCP are a characteristic of the entire American workforce, and that basing information requests on small pay disparities rather than the larger disparities incorporated into the threshold test will cause federal contractors to pay women more than they otherwise would, so as to avoid the burden of OFCCP investigations.  Therefore, United Space argues, the standard here employed by OFCCP has a discriminatory effect.[10]  The Constitution, however, only prohibits governmental actions undertaken with a discriminatory purpose.  *See Washington v. Davis*, 426 U.S. 229, 239 (1976).  In an attempt to demonstrate that OFCCP has such a discriminatory purpose, United Space notes that: (1) over a span of four years in one region, OFCCP only issued one request for further information based on a suspicion of pay discrimination against men, AR 1742–46, 1836; (2) an OFCCP regulation requires federal contractors to incorporate "specific practical steps" into their mandated affirmative action plans to address the potential underutilization of women and minorities, 41 C.F.R. § 60-2.10(a)(1); and (3) public statements by OFCCP indicate its concern with the gender pay gap.  AR 1521–31.

---

[10] As a preliminary matter, United Space is right to object to the administrative law judge's assertion that the administrative hearing over which he presided was not the proper forum in which to raise an equal protection argument, and that such a claim would be better raised in federal district court.  AR 1758–59.  "Although government agencies may not entertain a constitutional challenge to authorizing statutes they *must* decide constitutional challenges to their own policies whether embodied in generic rules or as applied in an individual case."  *Lepre v. Dep't of Labor*, 275 F.3d 59, 75 (D.C. Cir. 2001) (citing *Meredith Corp. v. FCC*, 809 F.2d 863, 872 (D.C. Cir. 1987)).  The administrative law judge was plainly wrong to suggest otherwise.

But none of this evidence shows that the analysis performed on United Space data was driven by a forbidden purpose—indeed, none of it concerns that analysis at all.

United Space cites *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13 (D.C. Cir. 2001), in support of its argument.  In that case, the D.C. Circuit found that certain FCC regulations pressured broadcasters to grant hiring preferences to racial minorities, and therefore violated the Fifth Amendment.  The Court of Appeals found evidence of discriminatory intent in a requirement that employers direct outreach to organizations "whose membership includes substantial participation of women and minorities."  *Id.* at 17–19; *see also Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 346 (D.C. Cir. 1998) (finding that FCC regulations requiring stations to "us[e] minority and women-specific recruitment sources" betrayed a discriminatory purpose).  The core of the *MD Broadcasters* theory is that governmental actions may not explicitly favor one gender or racial group over another.  No such forbidden favoritism is explicit in the analysis employed here—rather, the analytic method used is neutral on its face.  United Space's argument against it would suggest that some threshold disparity was constitutionally required.  The Court rejects that implausible result and the argument that stands behind it.

### iv.  Vindictive Prosecution

United Space goes on to argue that the OFCCP data request was a vindictive prosecution in violation of the Fifth Amendment.  A vindictive prosecution is one in which "the government acts against a defendant in response to the defendant's prior exercise of constitutional or statutory rights."  *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987).  A defendant asserting vindictive prosecution may prove her case either with objective evidence that the government intended to punish the defendant for asserting its rights, or by circumstantial

evidence that gives rise to a presumption of vindictiveness because the facts presented "indicate

a realistic likelihood of vindictiveness." *Id.* In the latter case, the usual burden-shifting

framework applies: the government must provide "objective evidence justifying the prosecutorial

action," *id.*, and, if it does so, the defendant must show that this evidence is merely pretextual.

*Id.*

Because there is no evidence of actual vindictiveness on the part of OFCCP, United

Space must demonstrate a presumption of vindictiveness by showing that the agency's action

was "more likely than not attributable to vindictiveness." *United States v. Safavian*, 2011 WL

1812348, at *4 (D.C. Cir. May 13, 2011) (internal quotation marks omitted). United Space

alleges that several agency actions taken in this investigation raise a presumption of

vindictiveness with regard to a previous OFCCP compliance review in which United Space

challenged the agency's methodologies and analyses. *See* AR 27–29, 252–54, 1502.

Specifically, United Space points to the OFCCP request for certain information that was at issue

in its previous audit, *see* AR 907, 1502, the agency's failure to retain the spreadsheet used to

perform several analyses, AR 1838, and the relative recency of the prior audit. However, a

"sequence of events is not alone sufficient to raise an appearance of vindictive prosecution,"

*Office of Foreign Assets Control v. Voices in the Wilderness*, 329 F. Supp. 2d 71, 83 (D.D.C.

2004), and neither is the other evidence sufficient to raise such a presumption. The discarded

spreadsheet was, as the administrative law judge found, simply a calculation tool, AR 814–17,

and the element of the data request that United Space points to was only added to address a

particular disclaimer made by United Space. AR 789–90, AR 1079. None of these actions, nor

the undertaking of an investigation three years after the prior investigation closed, was "more

likely than not" attributable to a vindictive purpose.

44

**E. Request for a Stay**

At oral argument, United Space requested that the Court stay any adverse judgment pending appeal.  The Court finds that United Space is unlikely to prevail on the merits for the reasons discussed above and that the company has not shown that it will be irreparably injured by producing the data that OFCCP has requested.  Moreover, the public interest lies in the efficient enforcement of Executive Order 11246.  *See Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958) (articulating the traditional factors to be considered in granting or denying a stay).

The Court does, however, grant a temporary stay of its judgment to allow the Court of Appeals to determine whether it believes a permanent stay to be warranted.  This judgment will become enforceable on November 28, 2011.

## V.  CONCLUSION

Despite the vigor with which United Space has litigated it, there is surprisingly little at stake in this case.  The Department of Labor has not accused United Space of employment discrimination.  It has not ordered United Space to permit agency investigators onto company premises.  The Department has merely required United Space to submit data about its employee compensation.  The Court understands that United Space and the entire community of federal contractors are keenly interested in how OFCCP decides whether to request additional data on a contractor's compensation practices, but that interest does not allow those companies or this Court to interfere with the agency's investigatory practices.  Submission to such lawful investigations is the price of working as a federal contractor.

For the foregoing reasons, it is this 14th day of November 2011, hereby

**ORDERED** that the government's motion for summary judgment [Dkt. # 18] is

**GRANTED**; further

**ORDERED** that United Space's motion for summary judgment [Dkt # 21] is **DENIED**; and further

**ORDERED** that this judgment will become enforceable on November 28, 2011.

Royce C. Lamberth
Chief Judge
United States District Court
for the District of Columbia